UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 2:21-cv-935 |
| v. | Jury Trial Demanded |
| BLESSING K. EGBON, | |
| Defendant. | |

# COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("SEC") alleges as follows:

## SUMMARY OF THE ACTION

1. The SEC brings this action against Defendant Blessing K. Egbon ("Egbon"), the former CEO of the Milwaukee, Wisconsin fuel services company Exit 7C, Inc. ("Exit 7C"), for making false and misleading statements and misappropriating approximately $2.15 million from investors in Exit 7C. Between August 2016 and March 2020, Egbon offered and sold $6.47 million in securities to at least 14 investors by providing the investors with fictitious revenue and profit figures and forged bank statements for Exit 7C. Shortly after receiving the investors' funds, Egbon began misappropriating the money and spending it on various personal expenses, including visits to nightclubs, chartered jets, villa rentals, and tickets to sporting events.

2. By engaging in this conduct, Egbon violated Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.

240.10b-5]. The SEC brings this action to hold Egbon accountable for his illegal conduct, permanently enjoin him from further violations of the federal securities laws, and to seek an officer and director bar, a penny stock bar, disgorgement and prejudgment interest, and civil penalties.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

4. Venue is proper in this Court pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. §78aa] because certain of the acts, practices, and courses of business constituting the violations alleged in this Complaint occurred within the jurisdiction of the United States District Court for the Eastern District of Wisconsin. In addition, during the relevant time period, Egbon resided and conducted business within the Eastern District of Wisconsin.

5. Egbon, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange in connection with the acts, practices, and courses of business alleged herein.

6. Egbon will, unless enjoined, continue to engage in the acts, practices, transactions, and courses of business set forth in this Complaint, or in similar acts, practices, transactions, and courses of business.

## DEFENDANT

7. **Blessing K. Egbon,** age 34, resides in Milwaukee, Wisconsin. Egbon founded Exit 7C's predecessor company in November 2015 and changed its name to Exit 7C in October 2016. Egbon served as Exit 7C's CEO from its inception until his resignation in July 2020.

## OTHER RELEVANT ENTITY

8. **Exit 7C, Inc.** was incorporated in Colorado in November 2015 under the name CoOp Fuels, Inc., with headquarters in Morrisville, North Carolina. The company's stated goal was to provide ethanol-based fuel to gas stations throughout the United States on a consignment basis. In October 2016, Egbon changed the company's name to Exit 7C, converted it into a Delaware corporation, and moved its headquarters to Milwaukee, Wisconsin. In July 2020, Exit 7C began winding down its operations. It was dissolved in October 2020.

## FACTS

9. Egbon founded Exit 7C in November 2015 as CoOp Fuels, Inc. and was its sole Chief Executive Officer (CEO). In October 2016, Egbon changed the company's name to Exit 7C and moved it to Milwaukee, Wisconsin. Around the same time, Egbon also expanded the company's business goals to include providing bulk fuel to gas stations, offering a mobile payment platform for gas purchases, and providing maintenance services to vehicle fleets. As Exit 7C's CEO, Egbon had exclusive control over the company and its finances.

10. From 2015 to 2020, Exit 7C generated approximately $400,000 in gross revenue and never made a profit. Almost all of the company's revenue came from providing maintenance services to commercial vehicle fleets and was generated between October 2018 and July 2020.

**Egbon Misled Investors and Misappropriated Investor Funds**

11. In mid-2016, Egbon applied for Exit 7C to participate in an accelerator program for start-up companies run by a Wisconsin-based venture capital firm that invests in high-growth start-up companies ("Firm A"). During the application and interview process, Egbon falsely represented to Firm A through emails that Exit 7C was generating cash flows of $15,000 per month and that its ethanol delivery business was profitable. In fact, Exit 7C was not earning any revenue at the time. Based on Egbon's misrepresentations, Firm A invited Exit 7C to join its accelerator program, one of only six companies out of hundreds that applied. Firm A provided Egbon with hands-on mentorship regarding how to develop Exit 7C's business, and invested $90,000 in the company in August 2016 through purchases of two convertible notes.

12. One of Egbon's mentors in Firm A's accelerator program ("Individual Investor A") also invested $25,000 in Exit 7C via a convertible note based on the false information that Egbon supplied to Firm A.

13. Additionally, a non-profit organization focused on helping early stage Wisconsin businesses invested $50,000 in Exit 7C through a convertible note in March 2017 based on information provided to it by Firm A.

14. Rather than using these investor funds to develop Exit 7C, as Egbon represented, Egbon spent most of these funds on his personal expenses.

15. Beginning in January 2017, Egbon began emailing monthly newsletters to existing and potential Exit 7C investors that contained false information regarding Exit 7C's finances and growth. The newsletters falsely portrayed Exit 7C as a successful, fast-growing company. For example, Egbon sent out an email newsletter on January 31, 2017 that stated that Exit 7C made $53,959.03 in gross fuel sales and $2,158.36 in revenue in January 2017, when in

fact Exit 7C made no money during that month. Based, at least in part, on the false financial information in the newsletters, Individual Investor A invested an additional $35,000 in Exit 7C common stock in January 2018.

16. In mid-2018, Egbon applied for an investment from a Wisconsin non-profit organization that supports minority entrepreneurs. Egbon drafted and submitted an application that contained fake monthly sales figures and financial projections, and Egbon falsely told the organization that Exit 7C had a valuation of $2.2 million. Based on the information provided by Egbon, the organization invested $50,000 in an Exit 7C convertible note in August 2018.

17. Also in mid-2018, Egbon solicited a California-based venture capital firm ("Firm B") to invest in Exit 7C. Egbon provided Firm B with extensive due diligence materials that contained false financial information, including forged bank statements, fake balance sheets, fake income statements, and a presentation deck drafted by Egbon that contained fictitious sales, profit, and EBITDA figures for 2017. On August 1, 2018, in reliance on the false information provided by Egbon, Firm B invested $200,000 in an Exit 7C convertible note on behalf of a fund it managed.

18. Shortly after investing in Exit 7C, Firm B's managing director introduced Egbon to the principals of three other venture capital firms who were his frequent investing partners. Firm B provided each of the firms with the presentation deck prepared by Egbon and gave them an overview of the financial information that Egbon had provided to Firm B as part of its due diligence. All of the financial information was fictitious. Egbon also provided the three firms with access to a virtual data room that contained the same fake due diligence documents that he had previously given to Firm B, including the forged bank statements. Based on this information, the three firms invested $75,000, $50,000, and $50,000, respectively, in Exit 7C

convertible notes. A limited partner in an investment fund controlled by one of the three firms also invested another $50,000 in an Exit 7C convertible note based on the false due diligence information.

19. In August 2018, investing partners of Firm B introduced Egbon to the principals of two additional investment firms, who spoke with Egbon and reviewed the fake financial information contained in Egbon's presentation deck as well as the fake due diligence documents that Egbon gave them through his virtual data room. Based on the information provided by Egbon, each firm invested $100,000 in Exit 7C convertible notes.

20. In September 2018, another venture capital firm invested $100,000 in an Exit 7C convertible note based upon its review of numerous due diligence documents given to them by Egbon that contained false financial statements, including bank statements, income and balance statements, and the presentation deck that Egbon drafted.

21. Egbon continued to send current and prospective investors monthly newsletters that contained fabricated financial information and gave the false impression that Exit 7C was a profitable, growing company until July 2020. Although Exit 7C generated some gross revenue from providing maintenance services to commercial vehicle fleets in late 2018 and early 2019, the company's expenses far exceeded the revenue generated, and Egbon continued to misappropriate investor funds in order to subsidize his own lifestyle and personal expenses throughout this time.

22. In June 2019, Firm B, through another fund that it managed, invested an additional $500,000 in Exit 7C via a purchase of preferred stock. As before, Egbon provided Firm B with false due diligence materials, including forged bank statements, a forged federal tax return, fake income and balance statements, and false monthly profit and loss tables.

23. In March 2020, an international venture capital firm ("Firm C") invested approximately $5 million in Exit 7C through a purchase of preferred stock. As with past investors, Egbon provided Firm C with false due diligence materials, including forged monthly bank statements and an investor presentation deck that fraudulently represented that Exit 7C had gross sales of $79.5 million, gross profit of $6.35 million, and EBITDA of $2.61 million in 2019. In reality, Exit 7C made less than $300,000 in gross revenue in 2019 and was not profitable that year. Egbon also provided Firm C with a term sheet that falsely represented that proceeds from its investment would be used "to enter new markets, expand capabilities within existing markets, further develop technology capabilities, hire key management team members, and for general working capital purposes and general corporate expenses."

24. In reality, upon receiving Firm C's investment, Egbon immediately began spending the funds on personal expenses, including chartering a private jet to travel to a luxury villa he rented in Arizona and purchasing large amounts of alcohol at the beginning of the COVID-19 pandemic in spring 2020.

### Egbon's Uses of Investor Funds

25. Egbon misappropriated approximately $2.15 million of the $6.47 million that he raised from investors. Of that amount, Egbon spent over $530,000 on luxury nightclub visits, over $269,900 on chartered jets, at least $88,800 on various credit card purchases, and $62,500 on villa rentals. Egbon also spent investor funds on sporting events and other personal expenses, including spending hundreds of thousands of dollars on his day-to-day living expenses. In addition, Egbon paid himself approximately $360,000 through direct transfers, payroll deposits, and cash withdrawals.

### Egbon's Fraud Unraveled

26. In July 2020, after learning of Egbon's possible misconduct, Exit 7C's board of directors restricted Egbon's access to company funds and began conducting an internal investigation. Based on the results of the internal investigation, Exit 7C's board asked Egbon to resign from the company and the board. In October 2020, Exit 7C's board dissolved the company, withdrew its corporate registration, and distributed its remaining funds to investors.

### COUNT ONE

### Violations of Sections 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]

27. The SEC realleges and incorporates by reference paragraphs 1 through 26.

28. Egbon knowingly or recklessly, or, with respect to subparts b and c below, negligently, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce, or by the use of the mails, directly or indirectly:

   a. employed devices, schemes, and artifices to defraud;

   b. obtained money or property by means of an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   c. engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

29. By engaging in the foregoing conduct, Egbon violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT TWO

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

30. The SEC realleges and incorporates by reference paragraphs 1 through 26.

31. Egbon knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use of the means and instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange:

    a. used or employed devices, schemes, or artifices to defraud;

    b. made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

    c. engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon any person in connection with the purchase or sale of any security.

32. By engaging in the foregoing conduct, Egbon violated, and unless restrained or enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## RELIEF REQUESTED

**WHEREFORE**, the SEC respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Egbon committed the violations charged and alleged herein.

**II.**

Enter an Order of Permanent Injunction restraining and enjoining Egbon, his officers, agents, servants, employees, attorneys, and those persons in active concert or participation with Egbon who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices, or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 thereunder [17 CFR § 240.10b-5].

**III.**

Order Egbon to disgorge the ill-gotten gains that he received as a result of the violations alleged in this Complaint, plus prejudgment interest, pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

**IV.**

Order Egbon to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], bar Egbon from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

**VI.**

Pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibit Egbon from acting as an officer or director

of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable applications or motions for additional relief within the Court's jurisdiction.

## VIII.

Grant such other and further relief as the Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby requests a trial by jury on all issues so triable.

Dated: August 10, 2021　　　　　　　Respectfully Submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

　s/ Som P. Dalal
John E. Birkenheier, Illinois Bar No. 6270993
Anne C. McKinley, Illinois Bar No. 6270252
Som P. Dalal, Illinois Bar No. 6296172
Attorneys for Plaintiff
United States Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
Telephone: (312) 353-7390
Fax: (312) 353-7398
BirkenheierJ@sec.gov
McKinleyA@sec.gov
DalalS@sec.gov